# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

LILLIAN G. POHL,

    Plaintiff,

v.                                                                         No. CIV 98cv0158 BB/JHG

KENNETH S. APFEL,
COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

       This matter is before the Court on Plaintiff's (Pohl's) Motion to Reverse and Remand Administrative Decision, filed November 2, 1998. The Commissioner of Social Security issued a final decision denying Pohl's application for disability insurance benefits and supplemental security income. The United States Magistrate Judge, having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, finds the motion is well-taken and recommends that it be GRANTED.

       Pohl, now forty-five years old, filed her application for disability insurance benefits on June 5, 1995, and her application for supplemental security income on November 8, 1995, alleging a disability which commenced October 24, 1994, due to pain in her neck, shoulder and back. She is a high school graduate with past relevant work as a leather caser/packager, line assembler, and inspector. The Commissioner denied Pohl's application for disability insurance benefits and supplemental security income both initially and on reconsideration. After conducting an administrative

hearing, the Commissioner's Administrative Law Judge (ALJ) found Pohl had the residual functional capacity for the full range of light work and was able to perform her past relevant work as a leather caser/packager. Thus, the ALJ concluded Pohl was not disabled within the meaning of the Social Security Act. The Appeals Council denied Pohl's request for review of the ALJ's decision. Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review purposes. Pohl seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §405(g).

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395. (10th Cir. 1994).

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson v. Sullivan*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments

severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse and remand for a rehearing, Pohl argues the ALJ's finding that she has no severe mental impairment is not supported by substantial evidence and is contrary to law, the ALJ's finding that her headaches are not severe is not supported by substantial evidence, the ALJ improperly substituted a credibility finding for a proper finding regarding her residual functional capacity, and the ALJ erred when he failed to follow the treating physician rule with respect to Dr. Gold's findings.

The record reveals on July 30, 1987, Dr. Gold performed surgery on a pituitary tumor. Administrative Record (AR) 144. After she recovered from surgery, her headaches were gone but she had back pain. *Id.* On October 26, 1987, Dr. Gold released her to return to work. *Id.*

On July 26, 1988, Dr. Bennahum reported Pohl had been his patient since July, 1987, when she underwent surgery for a tumor in the lower part of her brain. AR 145. Dr. Bennahum also stated she had osteoporosis and was unable to perform any jobs which involved sitting. *Id.* Dr. Bennahum prescribed vitamin D and calcium. AR 144.

On November 14, 1991, Pohl stumbled over a box at work and landed on the left side of her body, more particularly on her left shoulder, left knee, and left tibial area. AR 140;183. While there was no evidence of any abrasions, contusions, or bruising, she developed neck and shoulder pain

3

with a headache. AR 140;183. Dr. Zaenger advised Pohl not to work for several days, placed her on Ibuprofen, advised her to ice the painful areas, and take warm baths. AR 183-84. When Pohl returned for follow up on November 18, 1991, she had definite bruising but wanted to go back to work 182. Dr. Zaenger allowed her to do so but advised her to be careful. *Id.*

On November 20, 1991, Dr. Zaenger reported Pohl had tried to return to work, but was sent home after four hours due to pain in her neck. AR 181. A cranial nerve check was normal, but she had muscle spasms. Id. While Dr. Zaenger felt Pohl was overreacting, he removed her from duty status. *Id.* On November 27, 1991, she was showing definite improvement. AR 180 On December 18, 1991, Dr. Zaenger noted further improvement and continued Pohl on physical therapy and Tylenol. AR 179.

On January 6, 1992, Pohl reported left neck pain and headaches to Dr. Zaenger. AR 177. On January 20, 1992, she reported more headaches which were interfering with her sleep. AR 175. However, she was back at work full time. *Id.* She also reported she was forgetful and having problems with her thought processes. *Id.* Dr. Zaenger found a full range of motion in her neck and no evidence of any muscle spasm. *Id.* Dr. Zaenger prescribed Amitriptyline, ordered an MRI, and continued her on a full-duty status. AR 176. The MRI was normal. AR 173.

On April 2, 1992, Pohl told Dr. Zaenger she was still suffering from pain in her left shoulder and neck area. AR 172. He diagnosed trapezius muscle sprain, slowly resolving. *Id.* On May 20, 1992, Pohl reported she was still having neck pain, followed by throbbing headaches which made her left eye water. AR 169. Dr. Zaenger diagnosed cervical spine strain and possible cluster headaches. AR 169. He continued her on Ibuprofen and also prescribed Tenormin. AR 170.

On June 15, 1992, she was still in pain. AR 168. Dr. Zaenger questioned whether she was

4

actually taking the Tenormin. *Id*. He prescribed Flexeril and referred her for a consultation on her headaches. *Id*. When there was still no change on July 8, 1992, Dr. Zaenger prescribed Prozac. AR 167.

On August 6, 1992, Pohl reported she stopped taking Prozac because it made her "lungs swell up." AR 165. There was no change in her condition. *Id.* Dr. Zaenger ordered an arthritis profile drawn and prescribed Mobisyl cream for her neck. *Id.* On August 20, 1992, Pohl reported she was feeling somewhat better. AR 164. Dr. Zaenger noted an elevated ANA on the arthritic profiles and ordered an autoimmune profile and a thyroid profile. *Id.* On September 9, 1992, she was unchanged and Dr. Zaenger placed her on Buspar. AR 163. On September 30, 1992, cervical spine x-rays reveled no problems. AR 162. On December 2, 1992, Pohl told Dr. Zaenger chiropractic and massage treatments had helped her. AR 158. On January 11, 1993, she had no symptoms. AR 157.

On March 1, 1993, she told Dr. Kennedy she had increasing pain and numbness after a chiropractic treatment. AR 156. Dr. Kennedy referred her for an MRI. *Id.* The MRI revealed minimal degenerative disc and bony change at C5-6 without evidence of cord or root compression or impingement. AR 154. Dr. Kennedy diagnosed myofascial pain with minimal degenerative change at C-5,6. *Id*. On April 14, 1993, Pohl said she felt worse and she vomited once due to the Ibuprofen. AR 152. Dr. Kennedy diagnosed myofascial pain syndrome and administered three trigger point injections. *Id*.

On May 20, 1993, Dr. Jones diagnosed chronic myofascial neck and upper back pain and shin splints in the left lower leg. AR 150-51. He prescribed Relafen and referred Pohl for a course of myotherapy. AR 151. On June 8, 1993, Pohl reported the therapy made her worse and she had difficulty sleeping. AR 149. Dr. Jones discontinued the myotherapy, continued her on Relafen, and

prescribed Doxepin. *Id*. On August 20, 1993, Dr. Diskant diagnosed chronic myofascial pain syndrome, discontinued the Relafen, and prescribed Amitriptyline. AR 146.

On December 4, 1993, Dr. Rosenbaum completed a Workers' Compensation Administration form. AR 208-213. He stated Pohl could lift and carry up to ten pounds frequently and up to 25 pounds occasionally. AR 211. She could occasionally bend, crawl and climb, but could never squat or crawl. AR 212. She had moderate restrictions from working around machinery, marked changes in temperature and humidity and dust, fumes or gases. *Id.* On January 27, 1994, Dr. Rosenbaum wrote that osteoarthritis was a partial cause of Pohl's failure to improve following her accident of November 14, 1991. AR 205. A February 7, 1994 , EMG and nerve conduction study found no abnormalities. AR 188-89 A March 1, 1994, physical capacities assessment found no restrictions on her capacity to sit, stand, or walk. AR 194. On May 23, 1994, Dr. Rosenbaum stated he believed Pohl had reached maximum medical improvement and had a three percent whole body impairment. AR 201.

On April 18, 1994, Laura Sugars, physical therapist, examined Pohl. AR 197-200. She found Pohl had substantial left shoulder and neck tightness and pain which severely limited her ability to function. AR 198. Pohl's sitting tolerance was found to be one hour. *Id.* Ms. Sugars prescribed stretching exercises and recommended alteration of Pohl's work situation. AR 198-99.

On July 26, 1994, Pohl was admitted to Presbyterian Hospital with nausea, vomiting, and pain in her neck. AR 100. While a CT scan showed no acute abnormality or hemorrhage, there were abnormalities in the left, frontal area of her brain. AR 103. Dr. Gold diagnosed a possible viral illness with vomiting, and headache and prescribed Fiorinal. AR 132-33. On July 28, 1994, Dr. Gold found persisting cervical pain of a disabling nature without any objective abnormalities. AR 131. Another

6

MRI did not indicate any lesions. AR 129. Dr. Gold suggested massage and muscle relaxers. AR 131. Dr. Gold advised Pohl surgery might not correct her pain problem. AR 128

On November 3, 1994, after diagnosing cervical degenerative disc disease, Dr. Gold performed an anterior iliac fusion of C5-6 with iliac bone graft. AR 106-115. Pre-admission X-rays of anterior cervical discs were normal. AR 105. Dr. Gold noted the surgery was performed after a long conservative treatment for neck pain and headaches. AR 106. Pohl tolerated the procedure well. *Id.* On November 10, 1994, her wounds were healing well. AR 127. On January 23, 1995, Pohl told Dr. Gold she had the same type of pain as before the operation. AR 126. The pain was relieved somewhat if she wore a cervical collar. *Id.* On March 14, 1995, she still complained of pain in the left side of her head and neck. AR 125.

On May, 25, 1995, Pohl reported to Dr. Gold that she occasionally had severe pains in the side of her neck and head to the point of causing nausea and vomiting. AR 124. He considered sending her to an arthritis physician. *Id.* On June 13, 1995, Dr. Gold wrote while Pohl had good fusion at C5-6, the surgery had not been successful in relieving her pain. AR 123. However, Pohl had obtained relief with Fiorinal and continued to take Elavil. *Id.* Dr. Gold suggested she be evaluated by a rheumatologist and stated Pohl was completely unable to return to her past work of eight hour shifts at the leather company. AR 123.

On August 9, 1995, Dr. Gold filled out a workers' compensation administration form. AR 117-122. Dr. Gold again indicated she could not return to her past work. AR 118. Dr. Gold stated Pohl could sit walk or stand for one hour a day. AR 119-120. She could occasionally lift up to ten pounds and could occasionally bend squat, crawl, climb or reach. AR 120. Dr. Gold found she had no environmental restrictions. AR 121.

On July 24, 1995, Dr. Farrell evaluated Pohl. AR 220-22. Dr. Farrell found no muscle spasm, atrophy or other objective findings. AR 221. He diagnosed chronic post-traumatic myofacial pain syndrome involving left para-cervical area. AR 222. He recommended she undergo some further physical therapy, biofeedback therapy, an empiric trial of Nortriptyline, and advised her to attempt to reduce her Fiorinal intake. *Id.*

On November 8, 1995, Dr. Wellborn performed a physical medicine and rehabilitation consultation. AR 140. Pohl reported she slept poorly, her spirits were not good and she was depressed. *Id.* She did not participate in any hobbies and even driving bothered her. *Id.* She exercised very little and had been prescribed Prozac which was not helpful to her. AR 141. Cervical range of motion was moderately limited in all planes. *Id.* Impingement testing was negative, passive motion of shoulders was intact, and no muscle spasms were noted. *Id.* Dr. Wellborn diagnosed chronic pain syndrome with depression and no neurological abnormalities. AR 142. He prescribed Zoloft and encouraged her to get into a walking program. *Id.* He stated increased physical activity would be the best form of treatment. *Id.*

On November 21, 1995, Pohl returned and stated she tried to become more active by gardening. AR 139. Dr. Wellborn explained gardening was far in excess of what he wanted her to do and again advised her to start a walking program and do some resistance exercises. *Id.* Upon examination, Pohl was in no acute distress, but her affect was somewhat flat. *Id.* Dr. Wellborn increased her Zoloft and prescribed Ultram. *Id.*

On December 12, 1995, Pohl told Dr. Wellborn she had sharp pains on the left side of her head and she though the Zoloft might be bothering her. AR 138. She reported she was only taking two Ultram per day, although she could take up to eight. *Id.* She reported she was trying to become

more active but sometimes the pain was so bad she had to lie down for eight or nine hours. *Id.* If the pain was severe enough, she would throw up. Id. When Dr. Wellborn told her that was a very atypical response to pain, Pohl indicated some people with headaches throw up. *Id.* She still had a very flat affect. *Id.* Dr. Wellborn took her off the Zoloft and told her to increase the Ultram and her activity level. *Id.*

On December 19, 1995, Pohl called Dr. Wellborn and complained of very severe pain. AR 137. Dr. Wellborn prescribed Amitriptyline. *Id.* On January 11, 1996, Pohl called Dr. Wellborn with a lot of shoulder and neck pain. AR 224. She requested Fiorinal. *Id.* Dr. Wellborn stated that he did not feel this was an appropriate medication to take in the long term but he called in a prescription for ten tablets. *Id.* On April 1, 1996, Dr. Wellborn saw Pohl for a follow up appointment. AR 223. He affect was flat and she was in no acute distress. *Id.* She told him only Fiorinal helped to alleviate her pain but Dr. Wellborn refused to prescribe this drug. *Id.*

On June 20, 1996, Dr. Kodituwakku performed a neuropsychological consultation. AR 15-19. This report was included in the record after the ALJ issued his decision, but before review by the Appeals Council. Dr. Kodituwakku found Pohl performed poorly across the board. AR 18. Her level of cognitive functioning was found to be in the borderline range. *Id.* Dr. Kodituwakku concluded emotional disturbances such as depression, fatigue, and low effort may have contributed to her poor performance. AR 19.

At the administrative hearing of June 26, 1996, Pohl testified her low back pain had gotten worse since she last worked in November, 1994. AR 247. She had a lot of back pain with sitting and standing. *Id.* She could sit for 30 minutes and stand for ten minutes without pain. *Id.* Pohl testified her neck pain was worse since the fusion surgery and the pain was constant. AR 247-48. She could

9

sit in a reading and writing position for five minutes without pain. AR 248. The neck pain was aggravated if she used her left hand. AR 249.

Pohl testified she had headaches which varied in severity. AR 249. The only thing that alleviated the headaches was lying down. *Id.* Sometimes the pain was so severe she would vomit. AR249-50. Medications dulled the pain but did not make it go away. AR 250. She was able to lift up to ten pounds. *Id*.

She testified she was depressed because she suffered so much from her pain. AR 251. The depression interfered with her memory and concentration. *Id.* She was able to sleep for three hours before the pain would wake her up. AR 215-52. She had trouble driving a car because it was difficult to move her neck. AR 252. She was able to dust and do a little laundry. *Id*. Her family and her boyfriend had to help her around the house and to go grocery shopping. *Id.* Pohl testified her work as a caser involved lifting and sorting pieces of leather while standing. AR 253.

Pohl argues the ALJ's finding that she has no severe mental impairment is not supported by substantial evidence and is contrary to law. The ALJ concluded Pohl did not have a severe mental impairment. AR 30-31. This determination is not supported by substantial evidence.

The record establishes Pohl was prescribed the antidepressants Amitriptyline, Nortriptyline, Prozac, and Zoloft.[1] Pohl's doctors consistently described her affect as "flat." AR 138, 139, 141. Dr. Wellborn diagnosed Pohl as suffering from chronic pain syndrome and depression. AR 142. This report was included in the record after the ALJ issued his decision, but before review by the Appeals

---

[1] Amitriptyline, also known as Elavil, is indicated for the relief of symptoms of depression. Physicians' Desk Reference, 3163 (52nd ed. 1998). Nortriptyline, also known as Pamelor, is indicated for treating the symptoms of depression. Physicians' Desk Reference, 1889 (52nd ed. 1998). Prozac is indicated for the treatment of depression. Physicians' Desk Reference, 860 (52nd ed. 1998). Zoloft is indicated for the treatment of depression. Physicians' Desk Reference, 2230 (52nd ed. 1998).

10

Council. Therefore, the report is part of the administrative record to be considered when evaluating the Commissioner's decision for substantial evidence. *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994). Dr. Kodituwakku found Pohl performed poorly across the board. AR 18. He found her level of cognitive functioning to be in the borderline range. *Id*. Dr. Kodituwakku concluded emotional disturbances such as depression, fatigue, and low effort contributed to her poor performance. AR 19.

In light of this record, the ALJ's determination that Pohl did not suffer from a severe mental impairment is not supported by substantial evidence. Moreover, the ALJ did not complete a Psychiatric Review Technique Form (PRT form).When there is evidence of a mental impairment which allegedly prevents a claimant from working, the Commissioner must follow the procedure for evaluating mental impairments as set out in 20 C.F.R. § 404.1520a.*Cruse v. U.S. Dept. of Human Services*, 49 F.3d 614, 617 (10th Cir. 1995). At the administrative hearing level, the ALJ may complete the PRT form with or without the assistance of a medical advisor. 20 C.F.R. § 404.1520a(d)(1). However, the standard form must be appended to the decision. 20 C.F.R. § 404.1520a(d)(2). In this case, a PRT was not appended to the decision. Since the record contains substantial evidence of a severe mental impairment, a PRT form should have been appended to the decision. On remand, the ALJ should complete the sequential evaluation process, giving full consideration to Pohl's severe, non-exertional, mental impairment and append a completed PRT form to his decision.

Pohl also claims the ALJ's finding that her headaches were not a severe impairment is not supported by substantial evidence. The ALJ found there was no corroborating medical evidence substantiating Pohl's headaches. AR 31. The record establishes that Pohl reported her headaches to her doctors on numerous occasions, and even visited the emergency room due to her headaches. AR

101, 124, 125, 132, 138, 140, 168, 169, 175, 177 and 186. A CT scan found abnormalities in her brain. AR 103. In light of this record, the ALJ's determination that Pohl's headaches were not a severe impairment was not supported by substantial evidence. On remand, the ALJ should complete the sequential evaluation process, giving appropriate consideration to Pohl's headaches.

Pohl next contends the ALJ improperly substituted a credibility finding for a proper finding regarding her residual functional capacity. The ALJ's residual functional capacity analysis must be supported by substantial evidence. *Thompson v. Sullivan*, 987 F.2d 1482, 1491 (10th Cir. 1993). In this case, the ALJ relied on the absence of evidence in determining Pohl retained the residual functional capacity to perform the full range of light work. AR 32-33. This was not proper. Substantial evidence does not support the ALJ's determination that Pohl retained the residual functional capacity to perform the full range of light work. On remand, the ALJ should fully analyze Pohl's residual functional capacity.

Moreover, in evaluating a claim of disabling pain, the appropriate analysis considers (1) whether there is objective medical evidence of a pain producing impairment, (2) whether there is a loose nexus between this objective evidence and the pain and (3) whether, in light of all the evidence, both objective and subjective, the pain is in fact disabling. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994) (citing *Luna v. Bowen*, 834 F.2d 161, 163 (10th Cir. 1987)). The ALJ did not apply this analysis. On remand, the ALJ should apply the appropriate analysis to Pohl's complaints of disabling pain.

Pohl finally argues the ALJ erred when he failed to follow the treating physician rule with respect to Dr. Gold's findings. On August 9, 1995, Dr. Gold indicated Pohl could not return to her past work. AR 118. The ALJ disregarded this opinion. A treating physician may offer an opinion

which reflects a judgment about the nature and the severity of a claimant's impairments. *Castellano v. Secretary*, 26 F.3d 1027, 1029 (10th Cir. 1994). The ALJ must give controlling weight to this type of opinion if it is well supported by clinical and laboratory diagnostic techniques and it is not inconsistent with other substantial evidence in the record. *Id.* However, a treating physician's opinion is not dispositive on the issue of disability because final responsibility for determining the ultimate issue of disability rests with the Commissioner. *Id.*

The ALJ must consider the following specific factors to determine the proper weight for an opinion of the treating physician: (1) the length of the treatment relationship and the frequency of the examination; (2) the nature and extent of the treatment relationship and the kind of examination or testing; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *Goatcher v. Shalala*, 52 F.3d 288, 290 (10th Cir. 1995). In this case, the ALJ did not analyze the opinion of Dr. Gold in light of these factors. On remand, the ALJ should analyze the opinion of Dr. Gold in accordance with the six principles set out in *Goatcher v. Shalala*, 52 F.3d at 290 (10th Cir. 1995).

## RECOMMENDED DISPOSITION

The ALJ did not apply correct legal standards and his decision is not supported by substantial evidence. Pohl's Motion to Reverse and Remand Administrative Decision, filed November 2, 1998, should be granted. This case should be remanded to the Commissioner for completion of the sequential evaluation process with appropriate consideration accorded to Pohl's severe mental impairment, completion of a PRT form, completion of the sequential evaluation process with

appropriate consideration accorded to Pohl's headaches, full and complete assessment of Pohl's residual functional capacity, application of the appropriate analysis to Pohl's complaints of disabling pain, and analysis of the opinion of Dr. Gold in accordance with the six principles set out in *Goatcher v. Shalala*, 52 F.3d at 290 (10th Cir. 1995).

_____
**JOE H. GALVAN**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE

Within ten days after a party is served with a copy of these proposed findings and recommended disposition that party may, pursuant to 28 U.S.C. § 636 (b)(1), file written objections to such proposed findings and recommended disposition. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.